UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DEANNE MANSELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| ESOCO ORRINGTON, LLC | ) |
| (aka, PENOBSCOT ENERGY | ) |
| RECOVERY COMPANY), | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Deanne Mansell, by and through the undersigned counsel, complains of Defendant ESOCO Orrington, LLC (aka Penobscot Energy Recovery Company), as follows:

**INTRODUCTION**

1. This Complaint arises out of the unlawful employment actions taken by Defendant ESOCO Orrington, LLC (aka Penobscot Energy Recovery Company) ("ESOCO" or "Defendant") against Plaintiff Deanne Mansell ("Ms. Mansell" or "Plaintiff") in violation of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C § 12101, *et seq.* and the Maine Human Rights Act, 5 M.R.S.A. § 4551, *et seq.* The illegal practices alleged below were all committed within the state of Maine.

**JURISDICTION AND VENUE**

2. Jurisdiction properly lies in this Court pursuant to 28 U.S.C. §1331 and 29 U.S.C. §2617(a)(2). This Court also has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). In addition, it has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

3. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

4. Plaintiff demands trial by jury of all claims, to the extent allowed by law.

## PARTIES

5. Plaintiff is an adult citizen, who at all times relevant to this Complaint has resided in Hermon, Maine.

6. At all relevant times, Ms. Mansell was a "qualified individual" as defined by 42 U.S.C. § 12111(8) of the ADA. She was also a "qualified individual with a disability" as defined by 5 M.R.S.A. § 4553(8-D). Ms. Mansell was a qualified individual under the state and federal statutes because she could perform the essential functions of her employment position with or without a reasonable accommodation.

7. Defendant ESOCO Orrington, LLC is a waste to energy plant, licensed to do business in Maine. Upon information and belief it employed approximately 75 people at the time Ms. Mansell worked for it. Its parent company is NRG Energy, a publicly traded national energy production conglomerate. It employs more than 500 employees.

8. At all relevant times Defendant was a "covered" employer as defined by 42 U.S.C. § 12111(5)(A) because it engages in the business of waste management, recycling, and energy production. It is also a "covered entity" as defined 5 M.R.S.A. § 4553(1-B).

## ADMINISTRATIVE PROCEEDINGS

9. Ms. Mansell has timely filed and fully complied with prerequisites for administrative exhaustion required for jurisdiction in this Court under the ADA, as amended, and the Maine Human Rights Act, and thus all conditions precedent to the lawsuit within the meaning of Rule 9(c) of the Fed. R. of Civ. P. have been performed or have otherwise occurred.

10. Ms. Mansell filed a charge of discrimination with the Equal Employment Opportunity Commission and the Maine Human Rights Commission on September 27, 2017, and within 300 days of the conduct and action complained of. Ms. Mansell received her right to sue notice from the Equal Employment Commission dated June 19, 2019. (Exhibit A, attached.) She received her right to sue letter from the Maine Human Rights Commission dated May 15, 2019. (Exhibit B, attached). This lawsuit is timely filed within 90 days of each of these notices.

## FACTUAL ALLEGATIONS

11. In June 1999, Ms. Mansell was hired as an Accounts Payable Clerk by ESOCO. She was responsible for performing various duties related to accounting and accounts receivable.

12. In 2003, the title of Ms. Mansell's position changed to Accounting Administrator/Receptionist.

13. Although the term "receptionist" was added to her job title, of the 17 duties listed in her job description, only two are duties of a receptionist: answering the phone and greeting customers. The remaining 15 duties in Ms. Mansell's job description exclusively reflect her responsibilities as ESOCO's accounting administrator.

14. In terms of actual time spent, Ms. Mansell's two receptionist-related duties were the smallest part of her job. Phone calls were infrequent and customers rarely visited. Ms. Mansell estimates that the phone rang approximately one dozen times each day. Customers rarely had to be greeted. On some days, no one would need to be greeted.

15. In addition, Ms. Mansell's coworkers would regularly greet customers when Ms. Mansell was present in the office.

16. When Ms. Mansell was on vacation or not in the office for personal reasons, her coworkers answered the phone and greeted the occasional customer. This was easily accomplished and did not disrupt or otherwise impact the overall operation of the office.

### A. Ms. Mansell Suffers From A Disability As Defined By The Americans With Disabilities Act, As Amended In 2008

17. Ms. Mansell had a history of medical conditions, including fibromyalgia, lupus, and degenerative disc disease.

18. In 2004, Ms. Mansell was diagnosed with lupus and fibromyalgia. She was told that these conditions would result in chronic mild pain primarily in her back. Since that time she has dealt with these chronic conditions and treated their symptoms appropriately.

19. Each of these medically diagnosed conditions are impairments of a physiological nature—they relate to the way her body parts function. Each of these physical impairments constitute disabilities as defined by the ADA, as amended, because they substantially limit Ms. Mansell's major life activities.

20. The ADA, as amended, establishes that "major life activity" and "substantial limitation" are to be construed as broadly as possible, pursuant to 42 U.S.C. § 12102(4)(A).

21. Pursuant to the ADA Amendments Act of 2008, what constitutes a major life activity includes the operation of a major bodily function, "including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(B).

22. The legislative history to the ADA Amendments Act of 2008 states that substantially limits means, "restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." Managers Statement, 154 Cong. Rec. at S 8842. Making this determination relates, for example, to the way that individuals perform major life activities, and to the time it takes to perform them. Statement Rep. Stark, 154 Cong. Rec. at H8291; Statement of Rep. Courtney, 154 Cong. Rec. at H8296.

23. It is settled law that the MHRA should be construed and applied along the same contours as the ADA, as amended.

24. Ms. Mansell's lupus substantially limits the major life activity of her immune system's function.

25. Ms. Mansell's fibromyalgia substantially limits the major life activity of her immune system's function.

26. Ms. Mansell's degenerative disc disease substantially limits the major life activity of working and performing the tasks and duties required of her to work as an employee of ESOCO. It limits her ability reach, grasp, lift, carry, and bend and resulted in significant pain as compared to most people.

27. These physical impairments were chronic in nature.

**B.     Ms. Mansell's Physical Condition Deteriorates Due to Her Disabilities**

28. ESOCO knew that Ms. Mansell had these conditions because it had approved her for protected FMLA leave and had granted accommodations related to them.

29. In 2005, she used FMLA leave for these disabling conditions when necessary and also took advantage of an ESOCO policy that allowed employees to use time off that had accrued on an hourly basis.

30. In late 2015, Ms. Mansell developed increasing pain in her left shoulder, neck and arm.

31. By spring of 2016, Ms. Mansell's condition had further deteriorated. The pain was more severe than it had been previously.  She continued to treat with her primary care physician and chiropractor, without much improvement.

32. At this same time, Ms. Mansell also sought the opinion of a rheumatologist about the pain from which she suffered.

33. She believed the pain resulted from her lupus and fibromyalgia.

34. Because she was not improving, in early August 2016 Ms. Mansell had an MRI. The results revealed a herniated disc in her back that was either related to her lupus and fibromyalgia or to work-related repetitive motion. As a result, her physician reduced her work hours from 8 hours a day to 6 hours a day. ESOCO approved the reduced hours.

35. The reduction in hours did not improve Ms. Mansell's condition. As a result, on August 19, 2016, her doctor placed her out of work. Ms. Mansell remained out of work on family medical leave and short term disability from August 19, 2016 until December 23, 2016.

36. While she was out of work, ESOCO explored possible ergonomic upgrades to Ms. Mansell's work station with the hope that it would reduce her pain.

37. During Ms. Mansell's absence, ESOCO hired a temporary employee ("Temporary Employee") to perform her job duties.

### C. Ms. Mansell Returns to Work

38. Prior to allowing Ms. Mansell to return, ESOCO required that she obtain certification from her doctor as to whether she could return to work with or without an accommodation.

39. On December 19, 2016, Ms. Mansell's medical provider sent a letter stating that when she returns to work on December 23, 2016, she will have no restrictions.

40. Upon her return to work, Ms. Mansell felt that ESOCO viewed her negatively because she had been out on leave.

41. Ms. Mansell also believed that some of her fellow employees resented her for returning to work. Shortly after she returned, the HR director told her that ESOCO had expected her to go from short term disability to long term disability and then be terminated.

42. ESOCO was reluctant to work with her and address the ergonomics of her workstation, which made her feel like the company considered it a burden.

43. A work station evaluation of Ms. Mansell's work space had been performed prior to her return. In a letter dated December 19, 2016, the evaluation identified a number of ergonomic changes needed in Ms. Mansell's work station. Many of them, however, were delayed or left for Ms. Mansell to figure out.

44. In addition, the Temporary Employee ESOCO had hired in her absence remained employed when Ms. Mansell returned. Although the Temporary Employee was assigned to another project, it felt like ESOCO wanted the Temporary Employee to replace Ms. Mansell. Nevertheless, Ms. Mansell picked-up right where she had left off and performed her job.

45. Ms. Mansell was initially able to work full time. But within a few weeks her neck and back pain returned.

46. By mid-to late January, Ms. Mansell's pain negatively impacted her ability to work 40 hours each week. When the severity of the pain became too much, she would leave work and return home. As a result, for the remainder of January, February, and March of 2017, Ms. Mansell averaged approximately 32 hours of work each week.

47. Although Ms. Mansell was not working 40 hours per week, she was still completing all of the essential functions of her job. No one at ESOCO told her that her reduced schedule was a problem or that she was not performing her job adequately. She met all performance expectations.

48. Despite her continued achievement at work, by late February or early March of 2017, Ms. Mansell continued to feel as though her disability negatively impacted how people at work viewed her. She was concerned that ESOCO might use the fact that she sometimes left early against her.

49. To protect herself, in late February Ms. Mansell met with ESOCO's Human Resources person to discuss her pain and to see if she should get a doctor's note to support her need for a reduced schedule. A few days later, Human Resources responded and agreed that getting a note was a good idea. HR gave Ms. Mansell no indication that her requested accommodation presented any hardship or would be problematic for ESOCO.

50. Because Ms. Mansell was a qualified individual with a disability, ESOCO was obligated to provide her a reasonable accommodation unless it could show that the reasonable accommodation would impose an undue hardship.

51. Ms. Mansell's doctor's note restricted her work schedule to four, 8-hour days per week. ESOCO agreed to this reduced schedule and granted Ms. Mansell her requested accommodation.

52. Ms. Mansell continued to perform all of her job's essential functions with the reasonable accommodation of a reduced schedule.

53. Approximately three weeks after ESOCO approved her accommodation, one of Ms. Mansell's supervisors became aware that the Temporary Employee was actively looking for work with another employer.

54. The Temporary Employee did not have a disability.

55. The supervisor did not want to lose the Temporary Employee as an employee. As a result of learning that she was contemplating leaving ESOCO, the supervisor decided to send Ms. Mansell's medical provider a second letter that asked more questions about Ms. Mansell's condition.

56. On March 28, 2017, Ms. Mansell's doctor responded and advised ESOCO that she should continue working 32 hours per week and would be re-evaluated again in six months.

57. On March 31, 2017, Ms. Mansell received her yearly performance review from her supervisor. It was excellent. The review rated Ms. Mansell's attendance record as "Distinguished," the highest possible rating. It noted that she always complete assignments and was willing to assume new duties. It also noted that she was very good at completing the tasks given. At that time, Ms. Mansell also received a raise.

58. On April 6, 2017, Ms. Mansell was called into a meeting with her supervisor, human resources, and ESOCO's plant manager. During the meeting, Ms. Mansell was advised that because she could not work 40 hours per week, she could not perform the essential functions of her job, and was therefore she was being terminated.

59. Ms. Mansell was never informed why 40 hours per week was mandatory to perform the essential functions of her job. Prior to her termination, no one at ESOCO told her that the most recent note from her doctor had jeopardized her continued employment. There was no discussion of other available accommodations, including reassignment.

## CAUSES OF ACTION
## COUNT I
**(For Violation of the ADA)**

60. Ms. Mansell re-alleges and incorporates paragraphs 1-59 of the Complaint by reference.

61. Defendant ESOCO violated the ADA, as amended, when it discriminatorily terminated Ms. Mansell's employment on the basis of her disabilities. It further violated the ADA when it failed to provide her a reasonable accommodation or engage in any interactive process.

62. Ms. Mansell is a qualified individual with a disability as defined by 42 U.S.C. § 12111(8) of the ADA and 42 U.S.C. § 12131. She could perform her job's essential functions with or without an accommodation.

63. Ms. Mansell had a disability as defined by the ADA, as amended, of lupus, fibromyalgia, and degenerative disc disease at the time Defendant terminated her employment. As detailed above, these chronic conditions caused a physical impairment that substantially limited one or more of her major life activities.

64. Defendant ESOCO knew that Ms. Mansell had physical impairments that were disabilities under the ADA, as amended, because it had approved her application for family medical leave and just weeks before it terminated her, her request for a reasonable accommodation.

65. At all times in 2017, Ms. Mansell performed the essential functions of her job satisfactorily, even when she worked a reduced schedule. Exactly one week before ESOCO fired her, Ms. Mansell's yearly performance review rated her performance as excellent and her attendance record as distinguished. At no point had anyone at ESOCO told Ms. Mansell that she was not meeting performance expectations or that working a reduced schedule was problematic.

66. Ms. Mansell was terminated because of her disability. When ESOCO learned that a Temporary Employee without disabilities was considering leaving its employ, it contacted Ms. Mansell's doctor to request more detail about Ms. Mansell's condition, despite the fact that Ms. Mansell was performing all of her job's duties with a reasonable accommodation that ESOCO had approved just weeks earlier. ESOCO terminated Ms. Mansell.

67. ESOCO also failed to provide Ms. Mansell a reasonable accommodation or engage in any interactive process. ESOCO terminated Ms. Mansell based on her doctor's note without engaging in any interactive process and without informing Ms. Mansell that her job was in jeopardy or that she was not performing an essential function of her job. Ms. Mansell and ESOCO had no discussions about possible reasonable accommodations, including, but not limited to, reassignment.

68.     After terminating Ms. Mansell, the Temporary Employee replaced Ms. Mansell. The Temporary Employee did not have a disability.

69.     Defendant's discriminatory conduct has caused, and continues to cause, Ms. Mansell to suffer substantial physical and mental/emotional distress and inconvenience.

## COUNT II
### (For Violation of the MHRA)

70.     Ms. Mansell re-alleges and hereby incorporates by reference Paragraphs 1-69 as if set forth in their entirety herein.

71.     At the time of her termination, Ms. Mansell was disabled within the meaning of the MHRA, 5 M.R.S.A. § 4553. She had lupus, fibromyalgia, and degenerative disc disease. As detailed above, these chronic conditions caused a physical impairment that substantially limited one or more of her major life activities.

72.     Defendant ESOCO knew that Ms. Mansell had physical impairments that were disabilities under the MHRA because it had approved her application for family medical leave and just weeks before it terminated her, her request for a reasonable accommodation.

73.     At all times in 2017, Ms. Mansell performed the essential functions of her job satisfactorily, even when she worked a reduced schedule. Exactly one week before ESOCO fired her, Ms. Mansell's yearly performance review rated her performance as excellent and her attendance record as distinguished. At no point had anyone at ESOCO told Ms. Mansell that she was not meeting performance expectations or that working a reduced schedule was problematic.

74.     Ms. Mansell was terminated because of her disability. When ESOCO learned that a Temporary Employee without disabilities was considering leaving its employ, it contacted Ms. Mansell's doctor to request more detail about Ms. Mansell's condition, despite the fact that Ms.

Mansell was performing all of her job's duties with a reasonable accommodation that ESOCO had approved just weeks earlier.

75. ESOCO also failed to provide Ms. Mansell a reasonable accommodation or engage in any interactive process. ESOCO terminated Ms. Mansell based on her doctor's note without engaging in any interactive process and without informing Ms. Mansell that her job was in jeopardy. Ms. Mansell and ESOCO had no discussions about possible reasonable accommodations, including, but not limited to, reassignment.

76. After terminating Ms. Mansell, the Temporary Employee replaced Ms. Mansell. The Temporary Employee did not have a disability.

77. Defendant's discriminatory conduct has caused, and continues to cause, Ms. Mansell to suffer substantial physical and mental/emotional distress and inconvenience.

78. Defendant ESOCO intentionally and wrongfully discriminated against Ms. Mansell on the basis of her disability in violation of the MHRA when it terminated her because of her disability and failed to provide her a reasonable accommodation.

## **CLAIM FOR RELIEF**

Wherefore, Plaintiff seeks the following relief:

    a. A declaration that her rights under the ADA and MHRA were violated;

    b. Award any actual monetary losses sustained by Plaintiff as a direct result of the violations;

    c. Award the interest on the amount described on the items listed above, calculated at the prevailing rate.

    d. Award restoration and make-whole relief for the loss of any employment benefits or other compensation denied or lost by the Plaintiff;

    e.     Award compensatory damages against the Defendant because of the past and future physical and mental pain and distress and inconvenience caused by its discriminatory actions;

    f.     Award punitive damages because the Defendant acted with malice and reckless indifference of her rights;

    g.     Award attorneys' fees, litigation expenses and costs incurred in obtaining relief and pursuing this action;

    h.     Post judgment interest on all counts; and,

    i.     Any other relief this Court deems just and proper.

                                    Respectfully submitted,

Dated: August 2, 2019                    */s/ Samuel S. Riotte*
                                           Samuel S. Riotte
                                           McTEAGUE HIGBEE
                                           Four Union Park
                                           P.O. Box 5000
                                           Topsham, ME 04086
                                           (207) 725-5581
                                           sriotte@mcteaguehigbee.com

                                           *Counsel to Plaintiff*